We'll take Oldridge v. Layton, 22-3284. Let's see. Mr. Keeley? Yes, sir. When you're ready. May it please the Court, Counsel, I would like to reserve three minutes for rebuttal. The reason we're here this morning in this case is that my clients, the four defendants appellants, were denied qualified immunity unjustly and erroneously by the District Court in this First Amendment Section 1983 case brought by Lanza Oldridge, a former police officer of the Wichita Police Department. The District Court failed to conduct a proper, clearly established analysis, which is required in clearly established law analysis, which is required in all qualified immunity cases, and failed as to all of the defendants and appellants. Robert Layton is the city manager. Anna Hatter is the former deputy chief who recommended plaintiff's determination after a Professional Standards Bureau investigation, commonly referred to as PSB. And then Wanda Givens is a former deputy chief under former police chief Ramsey, who initiated the PSB investigation of Mr. Oldridge. And Jose Salcedo, likewise, is a former deputy chief who also initiated the PSB investigation. It must be pointed out, that wasn't until after Mr. Oldridge, or the plaintiff, had gone to the sheriff with an allegation against Chief Ramsey of felony perjury after, shortly after, plaintiff had first gone to district attorney. Well, it wasn't the same allegation, was it? I mean, he was making a different, he was talking about a different violation, potential violation. In your brief, you say it was virtually the same allegation. I still consider it virtually the same allegation. I mean, when he went to D.A. Bennett, who's a very experienced prosecutor, the plaintiff was raising the criminal communications statute for offense, a misdemeanor, which is basically the criminal liable statute in Kansas. And then when Mr. Bennett, who did an investigation, who read the entire deposition and then interviewed Ramsey, came to the conclusion that, one, that statute wasn't, it was probably unconstitutional. But two, more importantly, Ramsey, and this had to do with Ramsey's opinions as to the work performance of certain people in that PST Bureau, the detectives, which included Mr. Holders, but not exclusively. And Mr. Holders wasn't even mentioned in the, by name in the news article. But I don't, if we want to be strict on the district court's facts, district court set forth the facts that Mr. Ramsey, or D.A. Bennett, told the plaintiff that no crime had been committed. And I think it just, it's really stretching to say that Let me interrupt you. The issue here is what's usually considered the third element in a retaliatory firing case. Isn't it the balancing between the government interest and the free speech interest? Pickering balance. Yes. And what strikes me about this case is there's been no discovery. And that's so fact-laden and dependent on nuances and facts that I have, I have a problem here with your argument saying any, any possible balancing would show that the government interest in getting rid of this guy is, is, is greater. So don't we need to know more about what Oldridge was thinking, what he was trying to do when he made these reports? Don't we need to hear something from the defendants about why they thought this would be disruptive? There's no evidence of disruption. It's a prediction of disruption. And what sort of disruption are they talking about? Is that they're personally offended? Is it going to be morale problems? Even though Oldridge never disclosed, you know, it wasn't made public. Only the top brass knew about it. Don't we need to know those things? Doesn't the district court need to know those things? Doesn't a jury need to know those things to, to determine how to come out on, on the balancing test? Your Honor, we believe that we know those things based on the very extensive arbitration hearing after the termination in which. What do we know about? It was all sworn testimony. Yeah. What do we know about the thinking of the top brass regarding the disruption that this would cause? What did they say about that when they testified? I didn't, I missed it in your brief. There is no testimony or evidence, but where are we seeing it? You said we could get all this from the arbitration hearing. The actual, well, we don't, based on Lidle, which is we believe the closest case to this case. And you might win if the facts are close enough to Lidle, but don't you need to do all the facts? But Lidle, that's not an actual disruption case. There were some evidence of actual disruption, but it came in after the lawsuit was filed in Navaday. The police chief there didn't even know at the time you terminated Lidle that there was any actual disruption. And it's basically a potential disruption case. And the Lidle court said it's a potential disruption. And it says, it's like you accuse a fellow officer of secondary murder, you better have a factual basis. Well, but he made that accusation to the press. Wasn't it a public accusation? That's true. I mean, you can see components there that aren't present here. And don't you think we should have, don't you think we need to know what the top brass was thinking? Why would this cause a problem? If he's a subordinate detective, why is it going to be disruptive to the whole department? Because the top brass would take offense. Well, as in Helgen, the other case that we rely on heavily, that where the plaintiff, administrative secretary chief, doesn't have a name for a police officer who's suing the city, they said there, well, it's obvious. I mean, the circumstances make it obvious that this is going to negatively affect row efficiency, everything else. But it's not a presumption. I mean, you have to have something beyond speculation at this stage, right? Well, no, there's presumption of qualified immunity burdens on us. And the bottom line is you still got to do the qualified immunity analysis. No, no, my question is, it seems that you are, your position, it asks us to rely on some sort of presumption of disruption. Like, of course, this would be disruptive when, in fact, even at this stage, sort of the specter without evidence to support it is not sufficient. Isn't that what the district court found? We were on the interlocutory posture. We have to review the district court's conclusion that a reasonable jury could not find facts from which to determine that the governmental interest in this case is as you posit it. Well, except I would submit that this is all a legal issue. All of the qualified immunity, it is based on facts, but it's the analysis that's a legal issue, not a jury issue. Balancing is a legal issue, you're saying? Yes, absolutely. A balancing issue doesn't come to the jury. That's always a legal issue. But you have to have underlying facts. You have to have underlying facts, but what you're doing is plaintiff has the burden to come forward with an on-point Supreme Court case or an on-point 10th Circuit case or other established authority to be clearly established so that it's beyond debate. Are we saying this case is beyond debate? It's settled law. It's not the defense burden, it's the plaintiff's burden, and the courts… Don't you need to know the facts before you decide whether the law is settled on those facts? Yes, and we do know the facts based on the… This is no different than if it had been a trial. Why doesn't Wolf clearly establish that these types of allegations can be the basis for liability? Yeah, Wolf is different. It's not nearly as close to this case back here legally. In Wolf, you had a police chief and you had an officer, and there was definite tension and turmoil going on because of the police union dispute. And you had the police officer writing a letter to the kids safety's office saying, hey, the police chief has an anti-union bias. And, in fact, there was evidence to support that. But it wasn't an accusation of a crime, a serious crime of dishonesty, which in a law enforcement setting is tacked. I mean, that's a career ender. We know because of Deke Leo, even the accusation, it can be a career ender. So it's not nearly the – it's not an accusation of a crime. It's not – and besides that, the police chief, since he heard of the letter, came in and just immediately fired Wolf. I think you've made the case that we need more development because Deke Leo might be a career ender for an officer who testifies. The police chief ain't going to testify. It would be a rare case where he or she is a witness in a criminal prosecution. So don't we need to know what their thinking was? There might be a good reason. Lidl certainly helps you, but I don't think you're there without getting the facts developed. But they didn't – it wasn't in Lidl and even in Helvet. It's not a subjective interior. They looked at it as was the plaintiff's belief objectively reasonable? Do they have a factual, reasonable basis for the belief? And after DA Bennett said, you don't have a crime here, and the plaintiff, Oldridge, goes around to the sheriff to – I mean, that's – there's no reasonable belief as a matter of law. Do we know fully what Oldridge's information was and the basis of his contention that there was perjury? Do we know the surrounding circumstances? Yes. Yes. It's in the record. We know what he was thinking about. Yes. Yes. How do we know that? Did he testify? Yes, he testified extensively in our case. I would like to rebut. Before you sit down, why isn't Trask clearly established the fabricated investigation claim against the other – against Gibbons and Salcido? Yeah. Well, Trask is a causation-type case. He set the events in motion kind of thing. And, frankly, the district court got off on to that. The district court did absolutely no papering and balancing analysis or clearly established law analysis for Gibbons or Salcido. I mean, that was kind of a – I mean, you've got to do some analysis and deny qualified immunity with no amount of analysis. And second point on that is that there's case laws we submitted in our brief. If Layton and Hatter have qualified immunity for determination, so does Salcido and Gibbons because they'll deal with it based on determination. Thank you. Hi, I'm Don Peterson. I'm here with my partner, Sean McGibbon, and my client, Lance Oldridge, who's here with us. Powerful people sometimes do wrong things. Sometimes they abuse their power. Sometimes they lie. Sometimes they commit crimes. The public has a right to know those things. Yes, a government employee must consider the implications of how they report. And we have a body of law in this circuit that if you just leap to the media without taking some much more discreet approach. Well, is it a discreet approach that's required to go internal first? Is that a requirement? I don't believe so. If you look at what the cases say there, every one of those cases where the criticism is you didn't go internal is one they left in the press. They're factually not like this case. My client, what he did was the most secret approach he could have taken. No one in the department was informed other than the chief himself, and that was the decision of the DA to go interview him. And so when we get to this balancing, you blow the defendants had argued there was no public interest in this. And I think we established. What about the argument based on what was said in Lytle that it was an unreasonable charge to bring? And maybe not. Maybe he can bring it first to the DA, but then to go to the sheriff when the DA has said there's no claim. Doesn't that establish the unreasonableness of the claim, and therefore there's nothing to balance? No. There's two parts to this answer. The first part is Lytle does not say, just doesn't say this, that the question of an unreasonable claim is a question of law. There's a footnote, footnote one in Lytle. Says there was no, the plaintiff in that case did not claim there were any factual disputes. So of course that means everything that they're going to talk about is viewed as a legal question. The footnote one notes there's an open question in the circuits about whether there are pending fact questions that have to be resolved first. Depending on the situation, if there are open fact questions necessary for resolution of a step three matter, do those go to the jury or not? There was a split in the circuits, and the footnote acknowledges that and says we don't have to resolve that. So is the, I'm sorry to interrupt you, I just, is the issue on objective reasonableness, right? You're talking about whether the reporting of a matter of public concern, undisputed matter of public concern, after the DA rejects any viable claim at that point, whether that was objectively unreasonable. And just to understand your position, you're saying that on this record, that is not a conclusion that can be reached as a matter of law. Is that correct? For two reasons, and they relate to the Deutsch case that Your Honor wrote, that resolved this split, by the way. Okay? That case is very important to today. That case clearly sets out the limits of jurisdiction here. We're not talking about a scope of review. We're talking about jurisdiction. Because this is interlocutory, you can't be reviewing, and in your words, sufficiency of the evidence. Sufficiency of the evidence is not something that you get into on an interlocutory appeal at this stage. If Milgrim said, I think the evidence shows this, that's gospel today. Okay? And there's a bunch of reasons for that that I won't go into, but that's the rule. But there's other things in that Deutsch opinion that matter here, and one of them is you resolve that split in circuits, and you rule. If there are fact questions that have to be resolved at the step three stage, then they have to be resolved before you can get to a resolution of the qualified immunity and due balance. So if there are fact questions that need to be looked at, they need to be looked at. So what's the fact question about the reasonableness of bringing the claim to the sheriff? Okay. It's this. Did Lance Oldridge have a reasonable... There's really two. Did Lance Oldridge really have a reasonable basis for his complaints? And what impact did any of this have on efficiency? I'm focusing on the first part. Okay. On the first part. And it's, did he have a reasonable basis to bring the claim in the first place? And even if he did at that point, did he have a reasonable basis to take it to another law enforcement agency after the only one who could prosecute says no? Yes. I think there's something in the record saying that the leadership of the police department wasn't upset, didn't feel necessary to take action just because he went to the DA. Well, let me just say, the first thing that happened was he was charged with a PSB violation for going to the DA. Okay. And then not telling the sheriff that he had already gone to the DA. And when Lance was notified of that, he immediately came in and showed them the email and said, I did not hide anything. I told the sheriff. So what did they do? They just came up with some other new reason to fire him. Okay. That alone should tell you this was someone looking for a reason to retaliate. And Judge Melvin said that. He said, you can infer a wrongful attempt from those facts and we are bound by those today. Now to answer your specific question, I'm going to direct you to the point in the record that you ought to look at. Okay. Bear with me. Lance Oldridge's letter to the DA laid out very briefly what his concerns were. And he said, I have witnesses. I have documents. The DA never wanted to see them. The DA basically concluded. I think this is opinion. If you apply the statute to this, it would be unconstitutional. I don't agree with that. Okay. The DA did not ask who were the witnesses, did not ask for the documents. Well, Lance. So Lance's letter to the sheriff laid out. I thought the allegation was the testimony. And some hearing, I can't remember if it was a deposition or what, by the chief was perjurious. What witnesses are you talking about? So the sheriff gave a deposition in which he said that he got rid of some of the folks that were in PSB, that would include Lance. The sheriff or the police chief? The chief. The chief in his deposition said it was because they were engaging in various kinds of misconduct. They were engaging in biased investigations, that they were asking leading questions to protect officers, very specific statements about the reasons that he did what he did. When that became public, he came out publicly and went, oh, I wasn't saying they did anything wrong. They didn't violate any policies of the city, which those two things just don't even make sense. Those are, he engaged in a public relations campaign that doesn't fit what his testimony is. Now, what he told the media kind of exonerates Lance Oldridge. If all Lance cared about was himself, he probably would have let it go. But he now knows the chief said one thing in a deposition, he doesn't actually believe it. And Lance knows a bunch of things about what actually happened. And they are in the record. They are in the letter to the sheriff. The letter to the sheriff was much more detailed than what he told the DA. And part of his thought process was. How do we know that it was more detailed than what he told the DA? Well, because there's a letter to the DA that's a single page and then there's like a seven page letter to the sheriff. And there was no other communication between Oldfield and the, and the DA. What we know is Lance laid it out to the sheriff because the DA didn't look, he didn't talk to witnesses. Okay. Okay. And so he, in his mind, well, the sheriff is the other people that do investigations anyway. Probably should have gone to him first. So he goes to him. And the sheriff didn't really, I mean, the sheriff looked at it, but he didn't interview either of the witnesses either. But here's the point. The reason, the list of Lance Oldridge's concerns are actually in his six page explanation to the sheriff. And it's in the record. Now, I don't know that you got to get there. I don't think you have to go look at that because. Any findings about that specifically. If it were unreasonable. Then Lydell would suggest that the balancing is going to be. Tilted strongly against the plaintiff. Isn't that true? I suppose that's right. Yeah. Is it entitled to any first amendment protection? Yeah. So a little. It would get a little. And that's what judge Melvin found. He's right. Yeah. I mean, Lydell says that. If you. And let's back up. If you look at the citations in Lydell. There it doesn't say to any. Court. And it never says that there's a legal question about, is it just. Unjustifiable. You know, is it unreasonable? It really doesn't lay it out. Besides the two cases with a CF. And those cases. Are cases dealing with intentionally false or reckless statements. Now, that standard. That standard goes clear back to Pickering. Pickering borrowed that. From the, from the. Sole members of New York times. That's a fact question. Those are fact questions in libel cases. Those go to jury. Those are fact questions. There's no question. Those are fact questions. So there's, there's no authority in this circuit. That this issue becomes a legal question. Except. Plausibly. When there's. When there's a sufficiency of evidence finding. And there's no dispute about what the evidence is. In that way. On a summary. Summary judgment motion. You just say, well, it's a matter of law because there's no disputed fact. Right. That is not our posture here. This was a denial of. Qualified immunity below. And we aren't looking at sufficiency of evidence. As creating a legal question. To be certain. After the. Bounced today. Jurisdiction. After the DA. Denied the claim. Why wasn't it unreasonable for. Mr. Aldridge to then go through an internal process. Rather than. Forum shop with the, with the sheriff. Should he have gone through. Whatever processes that they have for making a complaint. I understand the idea. I think there's a few reasons. One is he really thought it was a crime. The place to go with a crime is. To law enforcement. Agencies, right. Second reason is it really. Ramsey's so high up. I mean, you're going to end up having to investigate himself. Effectively. And. There was no reason to think. The city manager was going to do anything. About this. And we now know. In hindsight, he wasn't going to do anything about it. Because he just blessed it. So. It was, it wasn't a plausible option. But in any event. I don't think there's any rule that he has to adopt. By far. The. The method that the court later would decide. The question is a balancing. And we're balancing. His first amendment, right. To assert a crime. And even if it weren't a crime, by the way. This Giglio business has been raised at all. Is this. This is so important because it could really get Ramsey in trouble. Of course. Of course, it's important that law enforcement be honest. And not lying depositions. Of course. That could be career ending. But that cuts the other direction. That's proof that this matters. That's why it's such an important matter. And why it's first amendment protected. That's not a reason not to blow the whistle. That's a reason to blow the whistle. The city manager made the termination decisions. Is that correct? Well, there was a recommendation. And then the city manager finally executed it. Yes. And I'm just looking at the underlying. Claim about the investigation as to Gibbons and Salcido. And, you know. Is Trask the best case for the clearly established proposition? Or is there something else that would be more on point? That's an employment case. Yeah, I mean. Title VII case. At the end of the day. The. Clearly established. As I understand it. It's supposed to be mainly about. Is the right clearly established? Should I know better? Well, in the factual circumstances. Trask definitely, I think, gives you an analogous principle to apply. But how is it the sort of factually analogous case that. The Supreme court would tell us would suffice. Well. If you're a part of you, they all met together. Evidence is Ramsey met with his command staff. They're both. They're all command staff. And then they work out what the process is going to be. Anna Hatter is going to step out so she can make the final decision. Not even part of the original recommendation. They make a recommendation. That turns out to just be. They turn in a PSB charge that just turns out to not be true. And then when that's proven not to be true, they make up a new one. They come up with a new one. A new theory. And so. I believe what Judge Melbourne is doing there when he found that's enough to infer that there was a wrongful intent. Is that just like we would in any situation. You know, when. When people do things that don't make any sense to justify what they were doing, you start to think. You know, like when I'm talking to my 16 year old son. Well, OK. So many sense. What's your real reason for this? You know, I mean, this isn't. It's it's clear because it's obvious when people make up things. Did you make that argument there? There is a line of jurisprudence that allows us kind of an off ramp there. Well, I think so. I mean, you think so? Thank you. Your time is expired. Thank you. Your Honor. One final point. And I want to go back to Judge Hart's question. Back issues for jury. Shouldn't we have discovery? Well. You can. I mean, this could be the same as. Judge Melbourne's facts found, which we are challenging at all. As far as suspiciously. We're just challenging this analysis. But it's over. The facts were alleged in their complaint. We filed a motion to dismiss. Qualified immunity cases are decided every day on motions to dismiss. Based on the legal analysis. Given the plaintiff's own facts. So it's different. The court doesn't say, oh, well, wait for discovery. I mean, these are the facts. And it's all legal analysis. Balancing. That's illegal. It's all clearly established. That's legal. None of that goes to a jury. Thank you, Your Honor. Thank you, Counsel. Your Honor. That right there is signed as Volume 1, page 209. Where the letter to the sheriff. Counselor, excuse cases submitted.